## Case No. 7,419.

JOHNSON et al. v. UNITED STATES.

[5 Mason, 425.] [1]

Circuit Court, D. Maine. May Term, 1830.

[1] [Reported by William P. Mason, Esq.]

Mitchell & Longfellow, for plaintiffs in error.

Mr. Shepley, Dist. Atty., for the United States.

STORY, Circuit Justice. This case comes before the court upon a writ of error, founded on a judgment in favour of the United States, upon a demurrer to evidence, preferred in behalf of the United States, and joined in by the other party. The general nature and operation of such a demurrer has been expounded with great force and correctness in the opinion delivered by Lord Chief Justice Eyre, in the case of Gibson v. Hunter, 2 H. Bl. 187. The supreme court of the United States has also, on various occasions, been called upon to discuss the nature and effect of the proceeding. But I shall do no more at present, than to refer to some of the leading cases, not meaning to comment on them. Young v. Black, 7 Cranch [11 U. S.] 565; Fowle v. Common Council of Alexandria, 11 Wheat. [24 U. S.] 320; United States Bank v. Smith, Id. 171. The result of the whole is, that the party demurring is bound to admit not merely all the facts which the evidence directly establishes, but all which it conduces to prove. The demurrer should state the facts, and not merely the evidence of facts; and it is utterly inadmissible to demur to the evidence, when there is contradictory testimony to the same points, or presumptions leading to opposite conclusions, so that what the facts are remains uncertain, and may be urged with more or less effect to a jury. The court, however, will, in favour. of the party, against whom the demurrer is sought, as it withdraws from the jury the proper consideration of his case, make every inference for him, which the facts in proof would warrant a jury to draw. But if the facts are so imperfectly and loosely stated, that the court cannot arrive at a satisfactory conclusion, that the judgment can be maintained upon the actual presentation of the evidence of these facts, then the course is to reverse the judgment, and to award a venire facias de novo. 2 H. Bl. 187, 209; [Fowle v. Common Council of Alexandria] 11 Wheat. [24 U. S.] 320.

In considering the evidence in the present case, 1 have felt very great difficulties in satisfying my own mind, that the facts are so stated, that the court can found any just conclusion as to the law applicable to the case. Under such circumstances, the proper

course would be to award a venire facias de novo, in order to bring the facts more perfectly before the court. But as no exception was taken by either side at the argument, and there was an implied waiver of any such exception; and as I am given to understand, that there are several cases depending upon the general questions discussed at the bar, I shall proceed at once to deliver my opinion upon them, passing by any farther consideration of the manner, in which they are presented on the record. It may be taken as a fact, though it is no where directly averred, that Swanton, the witness, was the collector of the customs for the district, at the time when the bond in controversy was given, and that he acted as collector de facto at the time of the supposed payment of the duties, and that the receipt was signed by his deputy de facto in the office. The bond, according to the condition, was payable on or before the 8th day of June, 1829; and the payment is supposed to have been actually made on the 12th of May, almost a month before the duties could have been demanded. It may be taken also as conceded by the parties, that William King was appointed collector, and duly approved by the senate on the 21st of April, 1829, upon the removal of Swanton from the office by the president; that Swanton had due notice of his removal, and of King's appointment, at least as early as the 4th of May; and that arrangements were made between them for the surrender of the papers and public property belonging to the office to King, as early as the 15th day of the same month; and of course, that the transaction, which gave origin to the present suit, took place in the intermediate period between the notice and the actual induction of King into office, which may be presumed to have been on the latter day.

A question very fairly open upon the record (which has, however, been expressly waived by the parties at the argument) is, whether by the appointment of King to the office, and due notice thereof to Swanton, the latter was not virtually removed from office, so as to cease, at least from that notice, to be collector de jure; and if so, whether all his acts as such, if not absolutely void, were not voidable by the government. That is a question of very grave importance, with which I should not choose to meddle unnecessarily. The collection act of 1799, c. 128, §§ 1, 21, 22 [1 Story's Laws, 573; 1 Stat. 627, c. 22], while it provides for the appointment of collectors, and for the manner of executing the duties of their office in cases of their death, and disability, and absence, (section 22), has left the case of a removal from office wholly unprovided for. And the act of 1820, c. 102 [3 Stat. 582], limiting the term of office of certain officers, and, among others, of collectors, has also left the case of a vacancy in office, produced by the expiration of such term, in the same posture.

The great case of Marbury v. Madison, 1 Cranch [5 U. S.] 137, great, not only from the authority which pronounced it, but also from the importance of the topics which it discussed, contains much reasoning, which might aid us in such an inquiry. It is there, among other things, said, "that when a person appointed to any office refuses to accept that office, the successor is nominated in the place of the person who has declined to accept, and not in the place of the person who had been previously in office, and had created the original vacancy." From this remark it might perhaps be thought, that the removal of the actual incumbent from office was complete by the new appointment, independent of any acceptance by the new appointee.

But waiving all consideration of this question, let us see what are the grounds, upon which the case was rested at the argument. And first, as to the plea of non est factum, it is admitted, that the bond was originally executed by the defendants, and was sufficiently binding in its legal operation. But the argument of the defendants is, that it is no longer a subsisting obligation; it is no longer their deed, having been cancelled, and being produced by them, in that state, in court, the issue ought to be found in their favour. When a deed is once legally cancelled, it is doubtless functus officio, and cannot again be set up as a subsisting deed. And doubtless the production of it in a cancelled state, is prima facie evidence to support the plea of non est factum. But every cancellation does not, per se, operate a destruction of the legal validity of a deed. If the cancellation be by mistake, or accident, or fraud, against the intention, or without the co-operation of the obligee, I have no doubt, that it may still be declared on as a subsisting deed by the obligee. In the case of Cutts v. U. S. [Case No. 3,522], which has been cited at the bar, I had occasion to examine the doctrine inculcated by the old authorities upon this subject. It does not appear to me, that there is any sufficient authority, upon which to found a different doctrine from that which I now express. If there are dicta, or even cases, looking somewhat at variance with it, they do not, in my humble judgment, entitle themselves to any serious regard, when compared with others, which contain more rational principles, consistent at once with common sense, and the just analogies of the common law.[2] If by mistake of the parties one bond is cancelled, instead of another; if by accident a seal is torn off or destroyed; if by fraud a name is erased, or any obligatory clause obliterated, it seems difficult to imagine, that, in any rational system of jurisprudence, such circumstances should be held to discharge the

[2] See Shep. Touch. c. 4, p. 66, § 6. Com. Dig. "Fait," 1, 2; Vin. Abr. "Faits," X, 1, 2, as to the general doctrines on this subject in the old cases.

obligation. But at all events there can be no doubt, that where a cancellation or destruction of the deed has taken place by the mistake or connivance or fraud of the obligor himself, without any assent of the obligee, the instrument itself may still be declared on as a subsisting deed. The authorities referred to in Cutts v. U. S. [supra], fully support this position.

In the present case no doubt exists, that the cancellation was made with the entire privity and consent of the obligors. If it has been wrongfully made, they cannot avail themselves of the fact to escape from their original personal responsibility. And the question, therefore, really resolves itself into the point, whether there has been a cancellation under circumstances, to which the law attaches validity. It is admitted, that the receipt of the deputy-collector de facto is genuine, and if payment was in fact made of that bond, as it purports to be in that receipt, the bond was legally extinguished, and the cancellation justifiable. There is no pretence to say, that the bond has been extinguished in any other manner; and we need not meddle with any other foreign considerations. If no payment has been in fact made, is the cancellation nevertheless to be deemed valid? In the first place, it is to be considered, that this is not an act done by the obligee in the bond with the privity of the obligors, but by an agent of the obligee; and that agent not a private agent, but one whose duties and powers are defined and limited by law. The obligors cannot plead ignorance of the limitations of such duties and powers prescribed by law; but they are bound, as all citizens are, to take notice of them. If a private agent were, by connivance with the obligors, to cancel an obligation contrary to the known instructions of the obligee, such an act would not bind the latter. Such an act, call it by however gentle a name we may, would be, in contemplation of law, a fraud upon the obligee. A fortiori, the act of a public officer in violation of the duties of his office, which duties constitute a part of the vital arrangements of the government, cannot be permitted to have any legal effect by way of defence to those who have participated in the violation, and encouraged and aided it. I hold it most clear, that the acts of a public officer beyond the scope of his powers, and in violation of his public duties are, in such cases at least, utterly void. A different doctrine would lead to the most alarming and mischievous consequences, and unsettle some of the best established principles of the law of agency. I, for one, do not incline to retract a syllable which was uttered on this subject in the case of U. S. v. Lyman [Case No. 15,647], and the case of The Margaretta [Id. 9,072]. Then, could the collector or his deputy lawfully cancel the present bond without an actual payment of the money due for the duties? Clearly not, unless we are at liberty to disregard the whole objects as well as the express words of the act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22], for the collection of duties. I meddle not with cases of discharges from debts by other officers, as by sheriffs upon executions, without payment, which may, for aught I know, be open to the government of other principles. Sheriffs are officers of the law, and not mere agents of private persons, or of the government; and how far their acts would be upheld in plain violation of their duty, and in fraud of the law, it is not now necessary to consider. In the case of collectors, there is an express provision of law to which this court must listen; and it would be monstrous to say, that the whole duties accruing to the government from importers, might be evaded by connivance with him in fraud of the law.

Then, it is said, that here the court cannot go into the consideration of the fact of payment, because the receipt of a public officer is an estoppel to the government to deny the payment. That proposition is liable to many objections. In the first place, the general principle in relation to governments is, that they are not bound by estoppels, under instruments created by themselves, although they may be where the estoppel is derivative from another under whom they claim a title. See Carver v. Jackson, 4 Pet. [29 U. S.] 1. In the next place, the act of an agent never can bind his principal by way of estoppel, unless it is within the scope of his agency. And in the next place, receipts, not under seal, do not belong to that class of instruments which are affected by the doctrine of estoppels. They have been solemnly adjudged to be open to contradiction and denial. See Harden v. Gordon [Case No. 6,047]; 1 Johns. Dig. Ev. 11, § 150; Veale v. Warner, 1 Saund. 325, and note: 11 Mass. 27, 143, 359; 17 Mass. 249; 3 Starkie. Ev. pt. 4, p. 1271. The receipt is, indeed, prima facie evidence of payment: but it is no more. If it has been signed by mistake or by fraud, or by other improper contrivances, without actual payment, it is not conclusive upon the government. Then, has there been any actual effective payment which can give support to the cancellation on the first issue, or establish the material allegations of the second issue? The admitted facts are, that there was no actual payment made in money: that the cancellation was made upon a check, being given by Williams & Co., or on their behalf, on the Lincoln Bank; that the check was never presented for payment at the bank, but a few days afterwards the check was given up to Williams, who gave in lieu thereof, the notes of Williams & Co. for the amount of the check, payable to the collector, or to him or his order; and by the collector put into the hands of one of his sureties, on his official bond to the government, by way of indemnity. Neither the check nor any equivalent fund ever came

into the hands of the new collector. Whether the check so received was a memorandum check (that is, a check given as a mere memorandum of the amount of a debt, and not a business check to be presented immediately at the bank for payment) or not, does not appear from the evidence. The collector states in his testimony, that he cannot say, whether it was or was not, though he considered memorandum checks as best, because the cashier would not be likely to pay them to a third person. That a jury would infer from these circumstances that it was a memorandum check, can admit of very little doubt; that a court upon this proceeding ought to infer it, is a matter of more question and difficulty. Upon the plea of payment, the onus probandi is upon the defendants; and therefore, if the evidence left the matter in doubt, that would be decisive against them upon that issue. To say the least, the prima facie evidence of payment, stated in the receipt, would be brought into most serious doubt by such a posture of the accompanying facts

But it is said, that payment by a check is a good payment; that this is the doctrine of the local law; and it is supported by the general custom of merchants in the payment of duty bonds. And it is farther contended, that the local law, and the custom, are equally obligatory upon the United States. I am not prepared to admit either position. It is not competent for the state legislation to regulate the rights of the United States, in respect to payments by their debtors. The general government has a right to prescribe its own rules on this subject. And as to the custom of merchants it can clearly have no operation to make law, much less to supersede the actual provisions of the law, in respect to the sovereign rights of the government. Without doubt, a common practice exists, founded upon the mutual convenience of the collector and the debtors at the custom-house, to receive the checks of the latter in payment of duty bonds. This, however, is a mere affair of private confidence; but if the check is not paid at the bank, it does not amount to a payment of the duty bond, or compromit the rights of the government, for the plain reason that the laws nowhere recognise any such right in the collector, to receive such checks in payment. Both he and the debtor, act, in such cases, at their own peril; the former in delivering up the bond, the latter in receiving it without actual payment. This is true in respect to checks received ordinarily in the course of business by the collector, where an immediate demand and payment thereof is intended and expected by the parties. But suppose the collector should keep the check until the bank had failed, or the party should after-

wards, by other checks, withdraw his funds from the bank, so that when presented, payment should be refused, would it be contended that the government were bound, or had made the check its own, by the improper act of its officer? I hold, clearly not. The seventy-fourth section of the collection act of 1799, c. 128 [chapter 22], declares, that all duties to be collected shall be payable in money of the United States, or in foreign gold or silver coins, at certain rates stated in the section; and even foreign coins are not receivable, which are not by law a tender, unless by a special proclamation of the president of the United States. This is a plain provision, which admits of no controversy. How can any collector, by any arrangement, not to say by any connivance with a public debtor, supersede it? If such debtor do concert an evasion of it with the collector, is it not a fraud upon the law? If so, a fortiori, a memorandum check would be no payment. Would there be any pretence to say that the collector had a right to receive any goods, or lands, or collateral securities in payment? Where are we to stop, if we do not stop at the plain terms of the act? But it is by no means clear, even by the local law, that taking a check in payment of an antecedent debt, is to be deemed a payment of the debt, unless it has been presented for payment and paid, or the creditor has made it his own by his conduct. The case of Dennie v. Hart, 2 Pick. 204, looks strongly the other way. And it is manifest that in our local law, varying in this respect from the general commercial law, a negotiable check or note is not deemed absolute payment; but it is open to be rebutted by any circumstances which establish that the parties did not so intend it. In the case now before us, it does not even appear that the debtors had any funds in the Lincoln Bank; the check was never presented or paid, and the drawers afterwards received it back without any payment. Under such circumstances, it would be difficult to maintain, before a jury, that the parties ever originally intended that it should be deemed an absolute payment, even if the case could be brought (as I think it cannot) within the reach of the local law.

Upon the whole, looking at this case with reference to the points made, and so elaborately discussed at the argument, and at those only, I am of opinion that the judgment upon the demurrer ought to be, as it was in the court below, in favour of the United States; and the judgment ought to be affirmed accordingly.