## CHISM *v.* PRICE.

Decided February 28, 1891.

1. *Swamp land act—A present grant.*

    The swamp land act of Congress of September 18, 1850, was a present grant of all lands coming within the description of the act; and when they are properly identified, the State's title relates back to the date of the grant.

2. *Conflict between swamp and railroad grants—Compromise act of 1879.*

    The act of March 13, 1879, " to authorize the Commissioner of State Lands to settle by compromise the conflict of title between the State and the railroad companies to selected and unapproved swamp and overflowed lands," did not confirm the title to swamp lands which had been sold by the railroad companies. It was an offer to make a compromise which was never accepted by the companies.

3. *Fraud in procurement of patent—Remedy.*

    While a stranger or occupant without right cannot assail a patent for fraud practiced against the State, a settler upon swamp land, having a preferred right of purchase, may attack a patent issued in fraud of his right, and, upon refunding the purchase money and interest, demand a conveyance from the patentee.

4.  *Swamp land—Settler's pre-emption—Act of 1879.*

    A settler upon land, which had been selected by the State as swamp and overflowed, and reported to the general land office prior to the passage of the act of Congress of March 3, 1857, but which has not since been approved or patented to the State, has a preferred right to purchase such land, under the act of March 18. 1879.

5.  *Authority of United States to dispose of swamp lands.*

    The act of the legislature approved January 11, 1851, empowering the board of swamp land commissioners to demand of and receive from the United States indemnity "for any swamp and overflowed lands within this State which have been sold or disposed of by the United States since the 28th day of September, 1850, or which may hereafter be sold or disposed of by the United States," did not authorize the United States to grant to railroad companies lands embraced within the swamp land grant.

6.  *Railroad grant—Exception as to swamp lands.*

    The railroad grant act of Congress of 1853 did not include swamp and overflowed lands previously granted to the State.

7.  *Construction of act locating Little Rock and Fort Smith Railroad.*

    The act of the Legislature approved January 19, 1855, "fixing the line of the Little Rock and Fort Smith branch of the Cairo and Fulton Railroad, and granting the lands donated by Congress to the State in aid thereof," did not convey to the railroad any lands embraced within the swamp land grant.

8.  *Construction of act of December 14, 1875.*

    The act of the legislature of December 14, 1875, which ratified and confirmed the titles to lands selected by the State as swamp and overflowed which had been disposed of by the United States either for cash or in payment of military or county warrants or scrip, does not apply to lands granted by the United States in aid of railroads.

9.  *Estoppel—Authority of Governor to bind State.*

    The act of the Governor in transmitting to the general land office the list of lands claimed by the railroad under the railroad grant does not estop the State to claim swamp lands included in such list.

10. *Railroad's selections—Conclusiveness of the land department's approval.*

    The approval by the general land department of the railroad's list of selected lands was not a determination that the lands embraced had not passed to the State by the swamp grant. The failure of the land department to determine this question leaves this matter open for judicial determination.

APPEAL from *Conway* Circuit Court in Chancery.

G. S. CUNNINGHAM, Judge.

*S. N. Williams* and *E. B. Henry* for appellant.

The swamp land grant of September 28, 1850, was a grant *in presenti.* 20 Ark., 100; *ib.,* 337; 29 *id.,* 56; 110 U. S., 695; 121 *id.,* 488. The railroad grant was approved February 9, 1853. *Prior in tempore potior est in jure.* The act of March 3, 1857, perfected the title to the selection of swamp lands which had been certified (as this land had) to the Commissioner of the General Land Office. 7 Otto, 345. The proviso in sec. 4232, Mansf. Dig., does not apply to this case. It only applies to land *not approved,* because of a conflict. *Benedict* v. *Harton,* Fed. Reporter, decided by Judge Caldwell. This act, March 13, 1879, was passed to meet difficulties and "conflicts" that arose in regard to selections, made by the State, *after the passage of the act of March 3, 1857.*

*Ratcliffe & Fletcher* and *G. W. Shinn* for appellee.

It is not disputed that the act of September 28, 1850, was a grant *in presenti,* but it required identification to render the title perfect. 121 U. S., 488. So the act of July 9, 1853, was a grant *in presenti.* The identification of these lands was fixed when the line of railroad was established; and when so identified, the grant took effect from its date. 103 U. S., 739; 112 *id.,* 720. The legislature of Arkansas, January 19, 1855, granted the lands embraced in the act of Congress of February 9, 1853, to the Little Rock and Fort Smith Railway, and adopted the survey made of said road. This fixed the limits and identified the lands. At this time these lands had not been selected by the State, and there was no identification of the same as inuring to the State under the swamp land grant. When the State subsequently selected these lands and reported the same to the United States land department, there at once arose a conflict. If the land was of the character embraced in the swamp land grant, it belonged to the State; if not, to the railroad. The power to settle this conflict was vested in the United States land department. That department, by the approval of the land to the railroad, settled the conflict in favor of the railroad; and its decision is conclusive. The swampy character of the land

from that time was no longer open to inquiry. 33 Ark., 836–7; 46 *id.*, 23; 13 Wall., 72; 93 U. S., 169; 6 Sawyer, 79; 7 *id.*, 48; 52 Iowa, 429. The act of March 3, 1857, could not interfere with any right acquired previously by the railroad. That act simply confirmed in the State the selections previously made, "*so far as the same remain vacant and unappropriated.*" This land had already been appropriated. See Acts 1855, pp. 149, 169; Acts 1856, p. 4–7, But the act of 1879, Mansf. Dig., secs. 4231–2, and the proviso thereto, settles all controversy and quiets the title to the purchaser. The State has always treated these lands as unconfirmed. Gantt's Dig., secs. 3860 *et seq.;* Mansf. Dig., secs. 4192 *et seq.* Chism's deed recites the fact that the land "still remains unapproved and unpatented to the State," and he cannot be heard to dispute the recitals in his deed. 39 Fed. Rep., 70. The swamp lands claimed by the State have never been treated as confirmed until certified to the State by the general land office. 33 Ark., 836. The State should now be estopped to claim the land. 7 Sawyer, 48; 3 Pick., 224; 17 Wall., 42; 7 Cal., 528. Under Mansf. Dig., secs. 4221 and 4226–30, appellee had the preference right to purchase from the State, and Chism in his affidavit perpetrated a palpable falsehood and fraud upon appellee; and whatever title he acquired will be held by him as trustee for appellee. 24 Ark., 40; 34 *id.*, 220. If Chism was not a pre-emptor, or had no improvement on the land, the Commissioner had no power to sell same without first advertising and offering at public sale. 24 Ark., 402 ; 39 Fed. Rep., 66.

*Dodge & Johnson* filed a brief for appellee on the motion for a rehearing.

HEMINGWAY, J. ˙The plaintiff claims the land in suit as part of the swamp land grant made by Congress, September 28, 1850, and the defendants as a part of the railroad land grant made by the government, February 9, 1853.

1. The swamp grant was *in presenti.* The rule is well established that the act of 1850 made a present grant of all lands coming within the description of

the act; and when they are properly designated, the con-
veyance relates back to the date of the grant. *Hendry* v.
*Willis,* 33 Ark., 833.

By the terms of that act, it was made the duty of the Sec-
retary of the Interior, as soon as practicable after its passage,
to make out an accurate list and plat of the lands granted,
and transmit the same to the Governor, and, at the request
of the Governor, to issue a patent to the State. The law
indicated no method by which the Secretary should ascer-
tain and designate the lands, but a practice grew up whereby
the agents of the State selected the lands and transmitted
lists thereof to him, through the Commissioner of the Land
Office, whereupon he certified back to the Governor a list
and plat of such as he approved as coming within the descrip-
tion of the grant. The Secretary was designated by the act
to determine what lands came within it, and his conclusion
was manifested as above indicated. In the operation of the
system great delay arose in procuring his approval of the
lists forwarded; and on the 3d of March, 1857, Congress
passed an act providing that all selections theretofore made
and reported to the Commissioner of the Land Office, in so
far as the same were vacant and unappropriated, and not
interfered with by any actual settlement under any existing
law of the United States, should be confirmed. By that act
all lands previously so selected and not appropriated or set-
tled on, as therein indicated, were brought within the pro-
visions of the original act, without ascertainment by the
Secretary. The State's selection of the land in suit had
been made and reported to the Commissioner, and this act
impressed upon it the character of swamp lands, and brought
it within the operation of the granting act, unless it came
within the exception as land previously appropriated or set-
tled under some existing law. The railroad filed its selec-
tion of this land after the passage of the act of 1857, but it
does not appear that it had appropriated it or settled on it
before that date. The Secretary of the Interior approved
its selection, but such approval was made expressly subject

to conflicting claims. He never adjudged that it was appropriated or settled by the railroad prior to March 3, 1857, or that the railroad, prior to that time, or any other time, was entitled to appropriate or settle upon it against the swamp land grant. There is no adjudication by the Secretary of the Interior; and upon the proof in this case we hold that the land did not come within the saving clause of the act of 1857. It may therefore be conceded that either grant would have conveyed the land if the other had been out of the way, in which case the elder would be held to prevail. *Martin v. Marks*, 7 Otto, 345.

2. Construction of the act of March 13, 1879 —Offer of compromise.

The defendant contends that although the State took this land as a part of the swamp land, the plaintiff cannot recover. As a reason therefor he urges that the State was the owner until 1881, and that, by the act of March 13, 1879 (Acts 1879, p. 64), it was provided that where any lands claimed by the State and the railroad company under the acts first referred to had been sold by the State or the railroad prior to said date, the title of the purchaser should be confirmed and quieted.

The act appealed to was entitled, "An act to authorize the Commissioner of State Lands to settle by compromise the conflicts of title between the State and railroad companies to selected and unapproved swamp and overflowed lands." It provided that in all cases where lands had been selected by the State and a railroad company, and, because of such conflict, had not been approved or patented to either the State or the company, the Commissioner of State Lands should be authorized and empowered to compromise such conflict with the company, and agree which of the lands should go to the State, and which to the company; and if any legal point should arise upon which the Commissioner and the company could not agree, the Commissioner should be authorized with the company to make an agreed state of facts and submit the same to the chancery court to decide the legal points arising thereon, with the proviso that in all cases where such lands had been sold by the State or the

company, the title of the purchaser should not be disturbed, but should be confirmed and quieted. The plaintiff contends that the land in controversy does not come within the provisions of this act, because this land had been approved to the State by the act of Congress of March 3, 1857, and the State act applied only to lands selected but not approved or patented. The defendant replies that the act of March 3d did not approve lands selected; but, in so far as they had not been appropriated or settled upon under existing laws, confirmed them, and expressly provided that they should be approved and patented according to the original act as soon as it might be practicable; and that the Secretary of the Interior had never approved or patented them to the State, as was thus provided, and had failed to do so because of the railroad's claim that it had previously appropriated them. Why the Secretary failed to certify the list and plat of this land to the Governor and to make a patent for it, is not disclosed by the record; but the fact of such failure appears. It is not necessary to determine the matter of difference stated, for in our opinion the act relied on is inapplicable for another reason. As its title and context clearly discloses, the act treated alone of the authorized proceeding between the Commissioner and the railroads to compromise conflicting claims. In the first place it authorizes the Commissioner to make a compromise on behalf of the State; it then provides that he may submit any difference of law between himself and the railroad for the decision of the chancery court, clearly intending any difference that might arise in the course of a compromise and that the court shall decide the legal questions submitted. Then follows the proviso that the title of all persons who had purchased either from the State or the railroad should be quieted. The legislature did not intend by that act to confirm and quiet titles of purchasers from the State to lands belonging to the railroad, for that was beyond its power. It cannot be thought to have intended to relinquish absolutely the State's claim to its lands that had been sold by the railroads, for that would be a bestowal

S C—17

of a bounty out of public lands upon the purchasers of another with no compensating returns. The proviso was intended to indicate and limit the Commissioner's authority in compromising the conflicting claims, and to prescribe a rule of decision to govern the chancery court in determining matters submitted to it. It prescribed terms upon which such claims might be submitted to compromise; and if the railroads agreed to a submission, they accepted these terms. If, in the course of the compromise, it should be ascertained that the State had sold lands belonging to the railroad, or that the railroad had sold lands belonging to the State, it was fixed by the terms of submission that the title of purchasers from each should be confirmed. The State thus gave up its lands sold by the railroad, in return for a relinquishment by the railroad of its right to its lands sold by the State. It may well have been considered that the losses on each side would be compensated in concessions by the other. But there is no proof that the railroad ever submitted to the conditions of the act, and therefore its purchasers can claim no benefits dependent on such submission.

3. Remedy for fraudulent procurement of patent.

It is next contended for the defendant that the plaintiff cannot recover because, at the time of the latter's purchase from the State, the former was, and the latter was not, entitled to purchase the land; that the plaintiff obtained his patent by means of a false affidavit, and thereby deprived the defendant of his right to obtain a patent. This, it is insisted, was a fraud on the defendant, and entitled him to demand a conveyance from the plaintiff.

A stranger or occupant without right cannot assail a patent for fraud practiced against the State; but an occupant with a right to purchase may attack a patent issued in fraud of his rights, and upon equitable terms may demand a conveyance from the patentee. *Lee* v. *Johnson*, 116 U. S., 48; *Paty* v. *Harrell*, 24 Ark., 40; *McIver* v. *Williams*, 24 Ark., 33; *Sparks* v. *Pierce*, 115 U. S., 408; *Bohall* v. *Dilla*, 114 U. S., 47; *Smelting Co.* v. *Kemp*, 104 U. S., 636; *Frisbie v. Whitney*, 9 Wall., 187; *Garland* v. *Wynn*, 20 How. (U. S.), 6.

The plaintiff obtained his patent by means of a false affidavit in which he alleged that he was in possession of the land, when in fact he was not but the defendant was in possession. The evidence shows that the defendant's grantors entered upon the land as early as 1871, held actual possession and made improvements; that the defendant purchased in 1880, went into possession, and made further improvements. The plaintiff purchased the land from the commissioner in 1881 as unconfirmed swamp lands, and brought this suit nearly seven years later. Did the defendant have a superior right to purchase it? If he did, he was deprived of it by the fraud of the plaintiff.

He insists that he had a right of pre-emption, and relies upon the act of March 18th, 1879, being section 4227 of Mansfield's Digest. It is as follows: " Pre-emptors and settlers on the selected and unconfirmed swamp lands of the State, and their legal representatives or assigns, shall have a preference right to purchase such lands by making satisfactory proof to the Commissioner of State Lands of their rights as such pre-emptors and settlers." To guard the preference right thereby conferred, the statute further provides that any person not a pre-emptor or settler, who shall apply to purchase any of such lands, shall make and file with the Commissioner an affidavit stating that the land applied for has no improvement on it, and that no person is residing upon it or claims it by virtue of any pre-emption certificate. A more jealous care of the interests of the settler could not have been manifested.

But does the defendant come within the provisions of the act? It relates to settlers on selected and unconfirmed lands only; and it may be insisted that this is not unconfirmed lands, but that it is confirmed land. It therefore becomes necessary to determine what the legislature meant by the term " unconfirmed lands." If the meaning is to be gathered from the significance of the same term in the act of Congress of March 3, 1857, it must be construed against

<span style="float:right">4. Settler's preemption.</span>

the defendant; for, as already stated, it is provided by that act that the title to this land be confirmed.

The word " confirmed " was employed in the earliest State legislation with reference to swamp lands. Gould's Dig., p. 717, sec. 3 ; *ib.*, p. 719, sec. 7. In the earlier acts the authority of the State's officers to make sales was confined to the confirmed lands, while the right of settlement and pre-emption was provided for the unconfirmed lands. So at one time the Governor was authorized to issue a patent only upon being satisfied that the lands were confirmed. And in the case of *Hendry* v. *Willis*, 33 Ark., 833, a patent issued by the Governor was attacked on the ground that the lands were not confirmed when it issued. In determining when the lands were confirmed within the meaning of that act, the court said : " The selections have been, in fact, made by the agents of the State, sent to the Secretary of the Interior, through the Commissioner of the General Land Office, approved and returned to the Governor. * * * When those lists so approved have been transmitted to the Governor, they have been treated in our legislative and official acts as confirmed, and so we must understand the word." That such is the accepted significance of the word in the land department of the State, is evidenced by the fact that the land in suit was carried on the Commissioner's books as unconfirmed, and so sold and described in plaintiff's patent, although the State's selection of it was on file with the Commissioner of the General Land Office on the 3d of March, 1857, and it was, within the meaning of the act of Congress of that day, then confirmed to the State. Then, in interpreting its meaning in the act relied on, shall we give it its meaning in the act of Congress, or its meaning as understood in the State land office, as used in prior acts of the legislature, and as accepted by this court ? In which sense did the legislature intend it ? It seems the more reasonable to conclude that it intended it in the sense in which it was then understood in legislative and official acts in this State, rather than that it intended to ignore this settled acceptation and adopt the

signification of the word in an act of Congress, a significa-
tion which for twenty-two years had not been adopted in
the administration of kindred acts embodying the same word.
The special provisions with reference to unconfirmed lands
were prompted by the recognized uncertainty as to the
State's claim, and the insecurity that purchasers would feel
as to lands of which the State did not have the ordinary
proofs and muniments of title; and it may well be pre-
sumed that such special provisions were intended to apply
so long as the Secretary of the Interior failed to do any-
thing that he ordinarily did to assure the State's right to
such lands; for until he did that, the State's land office could
not exhibit to applicants or furnish to purchasers the usual
evidence of a title. This construction of the acts seems
more reasonable also because it tends better to subserve the
State's general policy of protecting settlers on this class of
lands. It secures the State in its right to be paid for its
land, and protects the settler in the enjoyment of the fruits
of years of his toil, labor and outlay; and where a stranger
obtains the patent without right, it corrects the wrong with-
out imposing a penalty on him.

The judgment dismissing the complaint was erroneous,
and must be reversed. The judgment should have been for
the defendant on his cross-complaint; and if, within a rea-
sonable time to be fixed by the court, he should pay the
plaintiff the amount paid by the latter for the State's patent,
with interest from date of payment at 6 per cent. per an-
num, the legal title to the land should be vested in defend-
ant. As the defendant disputed the plaintiff's right to re-
cover anything and asserted title in himself, the costs of the
lower court should be divided between them. The cause
will be remanded, with directions to enter a decree as above
indicated.

BATTLE, J., dissenting. The opinion in this case is based
on the statutes which give the right of pre-emption to
swamp lands in certain cases. Treating the land in con-

troversy as swamp land, this court holds that appellee is entitled to it by right of pre-emption. In doing so it holds that the land is unconfirmed swamp land, within the meaning of those words as they are used in the act of 1879. From this interpretation of the statutes I dissent.

The land in question, together with other lands, was selected as "swamp and overflowed" land by the locating agents of the State, and the list containing it, duly certified by the surveyor general of the State, was forwarded to and received at the general land office of the United States, previous to the third day of March, 1857. By act of Congress of that date, it became confirmed swamp land. In *Martin* v. *Marks*, 97 U. S., 345, it was held that the effect of that act of Congress was to confirm such selections. The court said : "After the passage of that act (the act of March 3, 1857) the land department had no right to set aside the selections. The approval of them and the issue of patents to the State were mere ministerial acts, in regard to which that department had no discretion, unless it was found that the lands were not vacant, or had been actually settled on adversely to the swamp land claim. The act of 1850 was a present grant, subject to identification of the specific parcels coming within the description ; and the selection confirmed by the act of 1857 furnished this identification, and perfected the title."

Treating the land in question as a part of the swamp lands granted to this State by the act of 1850, as this court does, it was confirmed to the State by the act of March 3, 1857. In what way and for what purpose did it become unconfirmed? The act of 1879 gives to pre-emptors and settlers on the selected and unconfirmed swamp lands of the State, and their legal representatives or assigns, a preference right to purchase such lands by making satisfactory proof to the Commissioner of their rights as such pre-emptors and settlers. It does not undertake to define what is meant by unconfirmed swamp lands. That was unnecessary, as its meaning was well understood. The Supreme Court of the United

States, in *Martin* v. *Marks*, 97 U. S., *supra*, had previously
held that the land selected and reported previous to March
3, 1857, was confirmed by the act of Congress of that date.
The other lands selected as swamp lands by the proper
agents of the State, and reported as such to the Secretary of
the Interior through the Commissioner of the General Land
Office, when the selection thereof was approved and returned
to the Governor, had been treated and recognized by the
State as confirmed. There is nothing in the act of 1879 to
indicate that either of these classes of swamp land were not
recognized as confirmed swamp land. I cannot conceive of
any good reason why the legislature should for any purpose
treat either class as unconfirmed.

I have failed to discover any evidence that the State has
ever treated any of the lands confirmed by the act of March
3, 1857, as unconfirmed swamp land, except the tract in
controversy. Does the fact that the State so treated it enter
into the interpretation of the act of 1879? Does it throw
any light on the intention of that act? Is it to be presumed
that the legislature, ascertaining that the land in question
was treated as unconfirmed swamp land, concluded that all
other lands confirmed by act of March 3, 1857, were uncon-
firmed, and intended to be so understood in the act of 1879?
Certainly not. Yet such, it seems to me, must follow, if the
reasons given for the conclusion stated in the opinion of
the court be correct.

In the opinion of the court, the land in question is recog-
nized as confirmed swamp land of the State; but it is held
that it must be treated for the purpose of this suit as uncon-
firmed? Why? Because the State had so treated it. Suppose
the State had, did that give to appellee the right to hold it as a
pre-emptor and settler on selected and unconfirmed swamp
land? How did the mistake of the State affect him? He
was not misled or influenced by it. He was not lulled into
security or taken by surprise by any act of the State. The
State claimed the land. He considered it the property of
the railroad, and purchased and held it under the railroad

and adversely to the State. The State had the right to correct its mistakes until they passed beyond its control. Appellee lost nothing; neither did he gain anything by the mistake.

### ADDITIONAL OPINION ON MOTION FOR REHEARING.

Decided April 14, 1890.

HEMINGWAY, J. The defendant has presented a motion to modify the judgment rendered upon the hearing of this cause, and relies in support of it on matters not then argued by counsel or treated in the opinion delivered. We are asked to adjudge that defendant's title to the land under the railroad grant of 1853 is superior to plaintiff's title under the swamp land grant of 1850, and it is argued that such is the case for five reasons.

The first reason assigned is, that the State, by an act of the legislature approved January 11, 1851, authorized and empowered the United States government to dispose of lands within the swamp land grant, and that the government subsequently disposed of the land in suit by the act of 1853, making a grant to the State in aid of the railroad, and completed said disposal on the 17th of November, 1857, by approving to the railroad its selection of lands under the railroad act, including the tract in suit.

It is next insisted that the State conveyed the land, however acquired by it, to the railroad by act of the legislature approved January 19, 1855.

It is next argued that the lands passed to the State either by the swamp land grant or the railroad grant, and that all the title passed to the railroad by act of the legislature, approved December 14, 1875.

It is next insisted that the State and those claiming through it under the swamp land grant are estopped to contest title under the railroad grant, for the reason that the Governor transmitted to the government land office a list of the lands passing to the railroad under the railroad grant,

which list included the land in controversy, and that in pursuance thereof the Secretary of the Interior, on the 17th day of November, 1857, returned said list to the Governor with his approval.

The last ground of the motion is that the Secretary of the Interior, in the exercise of a jurisdiction conferred on him by the swamp land and railroad acts, adjudged that the land in controversy passed by the latter, and that this adjudication is final and conclusive.

We will treat the matters relied on in the order that we have stated them; and if we shall conclude that any one of them has the force claimed for it, it will entitle the defendant to the modification asked.

1st. Did the act of January 11, 1851, authorize the United States government to dispose of the State's swamp lands, and was a disposition of the lands in suit made to the railroad by the railroad grant act, or by the approval of the Secretary of the Interior.

5. Authority of United States to sell swamp land.

The only provision of the State act of 1851, relied on by the defendant, is as follows: "The board of swamp land commissioners are hereby empowered to demand of and receive from the proper accounting officer of the United States indemnity at the rate of one dollar and twenty-five cents per acre for any swamp and overflowed lands within this State, which have been sold or disposed of by the United States since the 28th September, 1850, or which may hereafter be sold or disposed of by the United States." Acts 1850-1, p. 137. This was passed soon after the swamp land act, and before any proof had been made to identify the lands coming within its provisions. Although the lands granted were identified by it as all the swamp and overflowed lands in the State, they were not identified by their numbers, and could not be stricken from the plats or lists of public land subject to ordinary entry, until the State should make its selections and furnish proof that such selections were of the character described in the grant. It was therefore inevitable that, in the course of rapid settlement

in a new State, the government should, without knowing it, make disposition of tracts of swamp land, unless it suspended all entries of its lands; and this course it did not see fit to take. It was to provide for such anticipated contingencies that the act was passed. We do not think that it contemplated that the government would knowingly dispose of the State's land, or intended to invest the government with any such general powers; but in view of the certainty that the government would, in the ordinary course of disposing of the public domain, unwittingly dispose of tracts of swamp land, the act empowered the board of commissioners to demand from the government the purchase price of its lands thus disposed of, and consented to accept the same in lieu of the land, rather than disturb titles thus acquired.

In view of this manifest policy, it may well be doubted whether the State's right to any lands thus disposed of would be barred until it had gotten from the government the price it received. But if it be conceded that the contention of the defendant furnished the correct interpretation of this act, it does not, as we think, sustain his claim; for if the power of disposal was conferred on, it was never executed by, the government.

6. Railroad grant excepts swamp land. The railroad grant act (approved February 9, 1853,) contained no specific description of the lands granted, but left them to be ascertained from their situation with reference to the railroad when its line was finally located, and expressly excepted from its provisions all lands in place, which the government should have sold, or otherwise in any manner have reserved when the route of the road was finally located. The description of the lands included in the grant, as well as those excepted from it, is in the language found in a similar connection in the many railroad grants made by act of Congress since 1850. But it has been ruled by the Supreme Court of the United States that the swamp lands would not have passed under the description of the lands granted, because it could not be supposed that Congress ntended to give to railroads lands previously segregated

from the public domain and devoted to another purpose; and that if the language of the grant was broad enough to include them, they would be excluded by the terms of the exception. *Railroad Company* v. *Fremont County*, 9 Wall., 89; *Railroad Company* v. *Smith, ib.,* 95; *Leavenworth, etc., R. Co.* v. *U. S.,* 92 U. S., 733.

The approval by the Secretary of the Interior of the selection by the railroad of the land in suit does not aid the contention that the government disposed of this land to the railroad. We need not consider what the effect would be of the secretary's approving to the railroad land not within the railroad grant (see *Leavenworth, etc., R. Co.* v. *U. S.,* 92 U. S., *supra);* but it is sufficient to say that the approval relied on was made subject to any interfering rights, and did not prejudice the State's interfering claims under the swamp land grant. That the railroad grant, and the Secretary's approval of its selection under it, did not prejudice the State's claim, was held by the Attorney General of the United States, the Commissioner of the Land Office, and the same Secretary who made the approval, soon after the conflict arose; and it was then settled, so far as the opinion of the officers in the land department of the government could settle the matter, that where the claims of the State and railroad conflicted, the State was entitled to such lands as were swamp and overflowed, and the railroad to such as were dry. Opinions of Black, Hendricks and Thompson, 1 Lester's Land Laws, pp. 564-5-6-7. And it was held by the Secretary of the Interior, in the case of conflict arising under the same acts in Missouri, that although land had been certified as a part of the railroad grant, it would be approved to the State as swamp land, upon proof that it came within the description of land granted by that act. Opinion of Thompson, 1 Lester's Land Laws, p. 569. We are therefore of opinion that the government did not dispose of the land to the railroad.

2d. Did the State convey it, though swamp land, to the railroad by act of the legislature approved January 19, 7. Construction of act of January 19, 1855.

1855? This is entitled, "An Act fixing the line of the Little Rock and Fort Smith branch of the Cairo and Fulton Railroad, and granting the lands donated by Congress to the State in aid thereof." As far as the title of an act can indicate its scope, this title limits the grant of this act to the land donated by Congress in aid of the road. That such is its scope, is made manifest by the language of the grant it contains, which is, the lands granted by Congress to aid .in the construction of a railroad, with no implication that the grant should extend to other lands. Acts 1854–5, p. 169, sec. 1. It is plain, we think, that the State intended to give the railroad the privilege to earn the lands it acquired under the railroad grant, and nothing more. And as the State acquired no swamp land under that act, it granted none by the act under consideration.

8. Act of December 14, 1875.

3d. Did the State confirm the title of the railroad by act approved December 14, 1875? In so far as it is pertinent in the consideration of this motion, that act is as follows:

"Whereas, Under the provisions of the act of Congress, approved September 28th, 1850, entitled, 'An Act to enable the State of Arkansas, and other States, to reclaim the Swamp Lands within their limits,' a large amount of lands were selected which were afterwards disposed of by the United States; and,

" Whereas, Upon proper proof that any lands so selected came within the provisions of the grant aforesaid, the United States government will refund to the State, in case of cash entry, the amount of purchase money, and an equivalent in lands for the tracts located with military bounty warrants or scrip; therefore,

" *Be it enacted by the General Assembly of the State of Arkansas :*

" SECTION 1. That the Commissioner of State Lands, by and with the approval of the Governor, be, and is hereby, authorized to appoint an agent, whose duty it shall be to procure the necessary proof in every case of the kind above

recited, and to make a final settlement with the United States government on behalf of the State.

" SEC. 7.   That all titles to lands embraced in this act are hereby ratified and confirmed, and made as valid as if deeded or patented by the State of Arkansas."

It is obvious that the effect of this act is to confirm the title to all persons holding any lands, within its provisions, under the United States, and it is therefore necessary to determine whether it applied to swamp lands which came within the designation of lands embraced in the railroad grant.   This is perhaps determined by the consideration of the first ground of the motion.   For we have seen that the government did not grant swamp lands to the railroad ; and as this act applies only to lands disposed of by the government, it does not apply to the class of swamp lands above indicated.   But the same result would follow, for another reason.   The preamble to this act recites that it was to apply to those lands only for which the government would make indemnity to the State, and that this comprised only lands sold for cash, warrants or scrip, which would not include lands donated in aid of railroads.   It is manifest that this act was passed in response to Federal legislation, providing for a settlement by the government with the State on account of swamp lands disposed of by the former, and that its scope was intended to be co-extensive with the Federal law.   If there were any doubts as to the kind of disposals to which it applied, it might be removed by reference to the Federal law.   Looking to it, we find that the settlement it provides for is only on account of the disposal of swamp lands for cash, scrip or warrants.   Acts March 2, 1855, and March 3, 1857 ; 1 Lester's Land Laws, pp. 248, 285.

4th.   Does an estoppel arise from the act of the Governor in transmitting to the general land office of the government the list of lands claimed by the railroad under the railroad grant, which included the land in suit?   It is insisted by the defendant that the State, through the Governor, claimed the land for the railroad, and caused it to be approved to the

9.   Authority of Governor to bind State.

railroad, and should not be allowed to dispute the railroad's title. We are advised of no law which cast upon the Governor the duty, or conferred on him the authority, to act for the State in selecting or claiming lands under the railroad act. It was not his duty, nor was he authorized, on behalf of the State, to adjust the conflict between the State and the road, or to classify the lands affected by the conflict as swamp or dry lands, or to determine what passed to the State as swamp lands or to the railroad as dry lands. All his powers were conferred and defined by law, and of their character and extent the railroad was apprised. As he had no authority to act for the State in selecting or claiming the railroad lands, his acts could not bind the State; *Leavenworth, etc., R. Co.* v. *U. S.*, 92 U. S., 733; *Lake Superior, etc., Co.* v. *Cunningham*, 44 Fed. Rep., 832–3; but he did not select or classify the lands for the road, nor profess to act for the State in claiming them; and of this the road was fully advised. The agents of the road selected and located its lands and prepared the lists to be submitted to the land department. As the grant was made to the State as trustee, the department declined to treat concerning them, except with the State officers; and therefore the road transmitted its lists of selected lands through the Governor. He did not examine the lands or scrutinize or compare the lists, as the road well knew. He was a mere conduit to transmit the road's selections, charged with the exercise of no discretion on behalf of the State and assuming none. The road acted upon its own examination and selection, and was in nothing influenced by any act done by the Governor. It should have known the character as well as the location of the lands selected, matters not by law coming within his cognizance. Moreover, the State's claim for the swamp lands was pending when the railroad's claim was made; and of this the road was advised, for it protested against the approval of them to the State, as not being of the class of lands granted by the act of 1850. I Lester's Land Laws, p. 566. Before, at the time, and after, the railroad's claim was presented, the

State was urging the approval to it of all the swamp lands to which the conflict between the grants extended; and it continued to press its claim until it was settled by the department that, of the lands affected by the conflict, such as were swamp and overflowed should be approved to the State, and such as were dry should be approved to the railroad. 1 Lester's Land Laws, pp. 596–600. If the determination of the land department above referred to did not satisfy the road, there is nothing in the published documents of the department to disclose it. Is this a case for the application of the doctrine of estoppel? The State is not ordinarily bound by an estoppel, and we deem it unnecessary to consider the circumstances under which it may be invoked. *Johnson* v. *U. S.*, 5 Mason, 425 ; *Carr* v. *U. S.*, 98 U. S., 433 ; *Lake Superior, etc., Co.* v. *Cunningham*, 44 Fed. Rep., *supra*. It can never arise from the act of an agent in excess of his known authority. To make it apply to title to land, it must appear that the party invoking it is induced to act in relation to the land by the party against whom it was invoked, that he was ignorant of the true state of the title, and that it would prejudice him to permit such party to assert his title. Those conditions are not present in this case. The State's right to swamp lands was a part of the law of the land, and as such actually known to the road. The road was induced to no act by the conduct of the State; and in the matter with reference to which the Governor acted, the road was fully advised and relied upon its own information. It could not have relied upon the act of the Governor, for he had no authority to prejudice the State's claim, and the road knew what his powers were. If his acts had been misleading, no act was done by the railroad on account thereof; for its work of construction was begun years afterward, and after the State was actively asserting its swamp land title which would have removed any possible misapprehension arising from the Governor's acts.

5th. Is the State's right concluded by an adjudication of the land department? If the department ever determined

10. Effect of approval of railroad's selections.

the State's claim to the land in controversy, it does not appear in the record. The approval of the road's list of selected lands was only a determination that the lands em braced were of the legal designation of lands that would pass by the railroad act, waiving the effect of interfering claims. Whether they passed as against the prior grant was not determined by the approval, and, so far as we are advised or the record discloses, has never been determined. It is certain that, after the approval, the land officers treated it as a question for further inquiry. That leaves the matter open for judicial determination. *Railroad Co.* v. *Smith,* 9 Wall., 95; *Railroad Co.* v. *Fremont Co.,* *ib.,* 89; *French* v. *Fyan,* 93 U. S., 172; *Iron Silver Mining Co.* v. *Campbell,* 135 U. S., 294; *Ehrhardt* v. *Hogaboom,* 115 U. S., 67; *Wright* v. *Roseberry,* 121 U. S., 505. And as the proof in this case shows that the land was swamp and overflowed, we adhere to our former decision that it did not pass to the railroad.

We have availed ourselves of all the aid offered by the zeal, industry and ability of counsel, and feel that they can have overlooked or omitted but little bearing upon the question under consideration; we have carefully considered the points pressed, realizing the great interest, public and private, affected by this decision. Our conclusion is, that the judgment formerly entered was right under the law, and that the motion to modify it should be denied.