KELLY *v.* COTTON BELT LUMBER COMPANY.

Opinion delivered March 4, 1905.

1. SWAMP LAND GRANT—CONSTRUCTION.—The Swamp Land Grant of Congress of September 28, 1850, was a present grant of all the lands coming within the description therein contained; and when they are properly identified under the terms of the act, the conveyance related back to the date of the grant. (Page 402.)

2. SWAMP LAND—PURCHASE FROM UNITED STATES—CONFIRMATION.— Although the Swamp Land Grant was a present grant of all lands falling within its description, the State, by the act of January 11, 1851, authorizing the acceptance from the United States Government of an indemnity of $1.25 per acre for swamp land which had been sold since the passage of the grant by the United States, "or which may hereafter be sold or disposed of by the United States," provided that the title of a purchaser of swamp land from the United States should not be disturbed. (Page 403.)

3. SAME—RAILROAD GRANT—CONFLICTING CLAIMS.—Under the act of January 16, 1861, granting the swamp and overflow lands in the Champagnolle Swamp Land District to the Mississippi & Red River Railroad Company, and providing that the governor should issue, in

lieu of stock in said railroad company, "a deed for such of said lands as shall then be confirmed to the State, and to which there shall be no valid conflicting claim," a deed of swamp land to the railroad company passed no title where the State had previously sold the land to another. (Page 404.)

Appeal from Calhoun Chancery Court.

CHAS. W. SMITH, Judge.

Reversed.

*Smead & Powell,* for appellant.

The act of 1850 made the Secretary of the Interior the judge of lands coming within the meaning of the grant, and his decision, in the absence of fraud or imposition, is final. 41 Ore. 570; 53 Ark. 833.

*Gaughan & Sifford,* for appellee.

The act known as the Swamp Land Grant was a present grant, vesting in the State, *proprio vigore,* title to all the land of the particular description designated; put the definition of boundaries, to make it perfect, can be entertained. 20 Ark. 100; 40 Ark. 328; 20 Ark. 337; 24 Ark. 443; 33 Ark. 833; 40 Ark. 23; 53 Fed. 697.

HILL, C. J. In January, 1850, Kelly, the appellant, in the exercise of "squatter sovereignty," settled upon a tract of land belonging to the United States. He held possession until 1877, since which time it has not been in actual occupancy of any one. The extent of Kelly's actual possession was about 20 acres, and the tract in which it was situated contained 80 acres. In 1873 Kelly purchased a tract in this same section adjoining this 80-acre tract, and this suit is over the two tracts.

The circuit court gave judgment in favor of Kelly to the extent of his actual occupancy, and from a judgment in favor of the lumber company for the remainder of that 80-acre tract and the tract purchased from the State in 1873 Kelly prosecutes this appeal.

The history of the titles is as follows: Kelly procured his neighbor, Franklin Little, to purchase of the United States the 80-acre tract containing his (Kelly's) improvements, which Little did on the 30th day of July, 1856, securing a cash entry certificate

and later a patent, and subsequently he conveyed the tract to Kelly. The other tract Kelly purchased as swamp land from the State on the 17th of July, 1873, and received deed therefor.

The lumber company's title to both tracts is based on the Swamp Land Grant of September 28, 1850, granting the swamp lands to the State, and an act of the General Assembly, approved January 16, 1861, entitled "An act to invest the swamp and overflowed lands in the Champagnolle Swamp Land District as stock in the Mississippi, Ouachita & Red River Railroad Company. Pursuant to the terms of this act the State on the 10th of October, 1873, deeded the land in controversy to said railroad company, and the lumber company has succeeded to its title. The lands in controversy were selected as swamp lands, and list containing them filed in 1853 in the general land office, and then approved, and the list confirmed on August 22, 1871, and all except the Franklin Little tract patented to the State, September 11, 1874. The Little tract was omitted from the patent to the State on account of its sale to Little in 1856.

1. The question is whether the Swamp Land Grant of September 28, 1850, conveyed this Franklin Little tract to the State of Arkansas, and rendered its subsequent sale by the United States Government invalid.

The Swamp Land Grant was a present grant of all the lands coming within the description therein contained; and when they were properly designated under the terms of the act, the conveyance related back to the date of the grant. *Hendry* v. *Willis,* 33 Ark. 833; *Chism* v. *Price,* 54 Ark. 251.

Shortly after the passage of the Swamp Land Grant the State passed an act, January 11, 1851, authorizing the board of swamp land commissioners to demand and receive from the United States Government indemnity at the rate of $1.25 per acre for swamp land which had been sold since the passage of the grant by the United States, "or which may hereafter be sold or disposed of by the United States." On March 3, 1857, Congress passed an act confirming to the State all lands heretofore selected under the Swamp Land Grant, "so far as the same shall remain vacant and unappropriated and not interfered with by an actual settlement under any existing law of the United States,"

and the same should be approved and patented to the State. Thus it is seen that the act of Congress, passed after Little purchased the land, excepted from the confirmation to the State the land sold Little because it was not "vacant and unappropriated;" and when the patent was subsequently issued for the other lands selected as swamp lands with it, it was properly omitted from the conveyance to the State. But it is insisted that, the grant being *in praesenti,* when the land was selected as falling within it, the Federal Government could not, by subsequent sale of it, divest the State's title. To meet just such complications, the General Assembly passed said act of January 11, 1851, and of its purpose this court said:

"This [act] was passed soon after the Swamp Land Act, and before any proof had been made to identify the lands coming within its provisions. Although the lands granted were identified by it as all swamp and overflowed lands in the State, they were not identified by their numbers, and could not be stricken from the plats or lists of public lands subject to ordinary entry, until the State should make its selections and furnish proof that such selections were of the character described in the grant. It was, therefore, inevitable that, in the course of rapid settlement in a new State, the Government should, without knowing it, make dispositions of tracts of swamp land, unless it suspended all entries of its lands; and this course it did not see fit to take. It was to provide for such anticipated contingencies that the act was passed. We do not think that it contemplated that the Government would knowingly dispose of the State's lands, or intended to invest the Government with any such general powers; but in view of the certainty that the Government would, in the ordinary course of disposing of the public domain, unwittingly dispose of tracts of swamp land, the act empowered the board of commissioners to demand from the Government the purchase price of the lands thus disposed of, and consented to accept the same in lieu of the land, rather than disturb titles thus acquired." *Chism* v. *Price,* 54 Ark. 251, 265.

It is clear that the case here is one within the letter and spirit of said act, and that both the State and the United States have provided for the protection of such titles. It is part of the history of the State that the various conflicts in rights growing out

of the Swamp Land Grant constituted a controversy of long standing between the State and General Government, which was finally adjusted by the acts of Congress and of the General Assembly in 1897. Such conflicts as the one in question, however, were, in advance, provided against affecting the title of the settler, and left any conflict to be settled between the two sovereignties.

The court erred in not sustaining the validity of the Franklin Little title.

2.   The other land went to the State as swamp land, and was purchased of the State by Kelly July 17, 1873, and subsequently on October 10, 1873, the State deeded the same land to the railroad company under which the appellee claims.   The contention of the appellee is that the act of January 16, 1861, was a present grant of the swamp lands in the Champagnolle District to the railroad company, that this land had been selected as swamp land before the passage of this act, and that the State had no title to grant to Kelly, in July, 1873, and the deed to the railroad company in October, 1873, did not determine the question of priority. If this act of January 16, 1861, was a present grant, like the Swamp Land Grant for instance, or the grants instanced in the majority opinion in *Wineman* v. *Gastrell*, 53 Fed. Rep. 697, the appellee's position would undoubtedly be correct; but it is a very different act in terms and in object.

Its title was to "invest" the swamp land in the Champagnolle district in stock of the railroad company.   Its first section reads, after describing the lands affected: "be, and the same are hereby granted to and invested as stock in   *   *   *   railroad company at the minimum price now established by law, and the Governor is authorized and required to subscribe for such amount of stock in said company as is equal to the value, at said prices, of all said lands which are now confirmed to the State, and to make similar subscriptions from time to time, as future confirmations of such lands shall be made to the State." This is clearly providing for a purchase of stock with the said lands at a fixed price, and is not an executed purchase, but an authorized one, and directs the Governor to make it.   The next section provides that when the company shall tender the Governor a certificate of stock for the amount subscribed, he shall cause to be made to the company a deed for such lands as shall then be

confirmed to the State, and to which there shall be no valid
conflicting claim. And it further provided that no deed issue
until the said lands should be patented to the State. The next
section provides for the dividends accruing from the stock to
be paid into the treasury. This act authorized the purchase of
stock in this railraod to be paid for when certificate of stock for
the amount subscribed (equal to the value of the lands) was
tendered. The purchase was to be consummated by the Governor
conveying land available therefor to the railroad; and to be
available the land had to be patented to the State, and there
should be not valid conflicting claim to it. The swamp lands in
this district were not withdrawn from sale, and to guard the title
of those purchasing of the State in the interval which would
elapse between the act and the sale to the railroad company the
Governor was directed not to deed any land where there was a
valid conflicting claim. This provision covered such cases as
this one.

A consideration of the whole act makes it clear that no title
passed under it until the purchase of the stock was consummated
by the deed of the Governor, and that was subsequent to Kelly's
purchase and deed, and conveyed nothing to the railroad com-
pany. Reversed, with directions to enter judgment in favor of
Kelly.

ON REHEARING.

Opinion delivered April 8, 1905.

HILL, C. J.   1. Counsel have pressed upon the court the
decision in *Fletcher* v. *Pool,* 20 Ark. 100, and suggest that prob-
ably the learned judge who wrote the opinion in *Chism* v. *Price,*
54 Ark. 251, which is quoted and followed in the opinion of the
court in this case, did not have his attention called to *Fletcher* v.
*Pool,* and that it was not intended to overrule *Fletcher* v. *Pool*
by that decision. While the language used by Mr. Justice
COMPTON in *Fletcher* v. *Pool* and that used by Mr. Justice HEM-
INGWAY in *Chism* v. *Price* may not be reconcilable in every par-
ticular, when applied to the facts decided in each case there is
no necessary conflict in the two decisions, and this court, in
following the later decision of *Chism* v. *Price,* is not intending to
overrule *Fletcher* v. *Pool.*

*Fletcher* v. *Pool* was dealing with conflicting purchases, one from the Government and one from the State after the Swamp Land Grant to the State. It was contended that the act of General Assembly of January 11, 1851, was in itself a confirmation by the State of sales made or to be made by the United States of swamp lands. The court held that such was not the case; that the purpose of the act was to look after the general interest of the State, and to endeavor to obtain a valuable consideration for her lands which the United States sold to purchasers. It was further held that the purchaser from the United States, while not directly benefited by said act, could indirectly benefit from it in this way: if no private rights derived from the State attached in the meantime, the receipt by the State of the indemnity would be treated as a sale by the State to the United States, and the title thus acquired by the United States would inure to the benefit of the purchaser, and in that way he would obtain a good title.

In *Chism* v. *Price* it was held that this act did not invest the General Government with general power to sell the State's swamp lands, but, in view of the certainty that the Government would unwittingly, in the ordinary course of business, dispose of tracts belonging to the State, the act authorized the commissioners to demand from the Government the price of the land so disposed of, and consented to accept the price in lieu of the land, rather than disturb titles thus acquired.

The decision in one case applies to conflicting asserted rights where the Government and the State each sell the same tract; the decision in the other refers to sales by the Government which the State has recognized by providing for an indemnity in lieu of the lands, or excepting lands so sold by the Government from its own grants and conveyances, or in other ways not necessary to consider now. The lands conveyed to the railroad company under the act of 1861 were not conveyed pursuant to an outright sale by the State, as those considered in *Fletcher* v. *Pool*, but were sold for stock in the railway company under limitations expressed in the act. In the first place, the lands had to be confirmed to the State before they were conveyed. The act of Congress of 1857 expressly excepted from the confirmation to the State all lands sold by the Government. In the second place, the land had to be patented before deed was to be issued. In the third place,

there was to be excepted from the conveyance of such confirmed and patented swamp lands all lands to which there were valid conflicting claims. Counsel argues on the other branch of the case that this applies to claims in existence at the time of the passage of the act. That is doubtless true, and the court believes it is also true of claims arising after the passage of the act, and before the consummation of the sale to the railway company.

In view of the fact that the Legislature in 1851 provided for accepting indemnity in lieu of the lands sold by the Government, and of the Government excepting from its confirmation lands sold by it, it is manifest that the act of 1861 intended to except from the lands to be sold the railway company all such lands as those in question where settlers had acquired Government titles, and did not intend to set up title in the railway company in opposition to the settlers. Under the policy of providing in advance against such conflicts, the act of 1851 enabled the two governments to settle many such conflicts without disturbing the titles of the settlers.

When this is not avoided, and two titles are brought in direct antagonism, like in *Fletcher* v. *Pool*, the prior title prevails.

2. Counsel elaborate and amplify their argument on the other branch of the case; but as no new questions are brought into the discussion, no useful purpose would be served in giving further expression to the court's view of the act in question. The arguments and authorities presented have been carefully considered, and the court is satisfied that it reached a correct conclusion.

The motion for rehearing is denied.